**POLYMER TECHNOLOGY CORPORATION, Plaintiff–Appellant,**

v.

**Emile MIMRAN, also known as Alan Franco, U.D.S. Export & Import, also known as User Designed Software, Optic Express, Inc., National Contact Lens Co., International Contact Lens Lab, Cosmetics Plus, Price Wise, Inc., Defendants–Appellees.**

No. 1375, Docket 92–7177.

United States Court of Appeals, Second Circuit.

Argued April 3, 1992.

Decided Sept. 11, 1992.

As Amended Nov. 25, 1992.

</div>

G. Roxanne Elings, New York City (Harley I. Lewin, William M. Ried, Lewin & Laytin, of counsel), for plaintiff-appellant.

Philip E. Roux, New York City (Milton S. Gould, Jonathan A. Kenter, Shea & Gould, of counsel), for defendants-appellees.

Before: KEARSE and MAHONEY, Circuit Judges, and RESTANI, Judge *.

RESTANI, Judge:

This action involves claims for trademark infringement, trademark counterfeiting, false designation of origin, fraud and unfair competition under the Trademark Act of 1946, 15 U.S.C. §§ 1051–1127 (1988) ("Lanham Act") and New York state law. The district court denied plaintiff's motion for a preliminary injunction, and indicated its intent to award defendants damages from the injunction bond. We reverse and remand for further findings.

Plaintiff, Polymer Technology Corporation ("Polymer") manufactures and sells ophthalmic products, including solutions for the care of contact lenses. Defendant, Emile Mimran ("Mimran"), also known as Alan Franco, owns a number of businesses that distribute ophthalmic lens care products. These businesses include Optic Express, User Designed Software, and Spare Lens, doing business as American Contact Lens Association, all of which are named as defendants in this action (collectively "Mimran defendants").[1]

Polymer sells its lens care solutions under the federally-registered "BOSTON" trademarks. Three solutions are at issue: lens cleaner, conditioning solution, and re-conditioning drops. Polymer distributes its solutions in two distinct channels of trade: one line of solutions is sent to distributors for resale to optometrists, ophthalmologists and other eye-care practitioners ("professional solutions"); the other line is distributed in the retail market ("retail solutions"). Retail solutions are sold for profit; professional solutions are sold at a loss, and are intended to encourage retail sales.

The professional and retail solutions differ in several respects. Retail solutions are packaged individually.[2] The outer packaging contains warnings concerning contamination, contraindications, and shelf life. The outer packaging also contains a list of active ingredients and preservatives, a notice that the contents are sterile, and tamper-evident seals on the top and bottom flaps. Labelling and packaging of retail solutions must receive premarket approval from the Food and Drug Administration ("FDA") and comply with its regulations.[3]

In contrast, the professional solutions are packaged in kits containing three solutions each. There are two types of kits: the "Care System" which contains each of the three solutions in full retail size; and the "Starter Kit" which contains reduced sizes of the solutions.[4] Some of the profes-

---

* Honorable Jane A. Restani, of the United States Court of International Trade, sitting by designation.

1. The remaining defendants, other than Alpha Omega, stipulated to a preliminary or permanent injunction; Alpha Omega defaulted.

2. The only exception is the "Convenience Pack," which is a combination package containing reduced sizes of two solutions.

3. The FDA regulates the manufacture, packaging, labelling and distribution of contact lens solutions. *See* 21 U.S.C. § 301, *et seq.* (1988); 21 C.F.R. §§ 200 *et seq.*, 800 *et seq.* (1991). Lens care solutions are classified as class III devices. 21 C.F.R. § 886.5918 (1991). This class consists of devices for which premarket approval is required because "insufficient information exists to determine that general controls are sufficient to provide reasonable assurance of its safety and effectiveness." 21 C.F.R. § 860.3(c)(3)

(1991). Premarket approval is also required for the labelling on the solutions. 21 U.S.C. § 360e(c)(1)(F) (1988). The regulations require the "sterile" notice, adequate warnings concerning contamination, and the tamper-evident seal. *See* 21 C.F.R. §§ 200.50(a)(3), 200.50(b)(2), 211.-132(b) (1991). Polymer claims that a list of active ingredients and preservatives is also required. *See* 21 U.S.C. § 321(k), (n) (1988). Sale of solutions in a form that has not been approved by the FDA is prohibited, and carries criminal penalties. *See* 21 U.S.C. §§ 321, 331, 333 (1988). The regulations apply to solutions sold at retail; plaintiff claims the professional solutions are exempt. *See, e.g.,* 21 C.F.R. § 211.132 (1991).

4. There is some discrepancy between the parties as to the names of the kits at issue. Several names appear: Starter Kit; Advance Starter Kit; Care System; and Advance Care System. Mim-

sional kits contain labels such as: "Not for Sale"; "For Dispensing by an Eye Care Professional Only or for Professional Dispensing Only"; and "For Dispensing by An Eye Care Professional Only."[5] The outer packaging for the professional solutions does not contain a list of active ingredients or preservatives, nor does it contain warnings. In addition, the professional solutions, particularly those contained in the Advance Starter Kit, do not always contain the tamper-evident seal.[6] The professional kits are not submitted to the FDA for approval because they are not intended for retail sale.

Polymer claims that Mimran obtains the professional kits and resells them in the retail trade; the Mimran defendants do not deny this allegation. Polymer also alleges that Mimran breaks down the kits and sells individual bottles of the professional solutions at retail.[7] The Mimran defendants deny tampering with the packaging, and claim that Polymer is simply trying to enforce a pricing scheme.

## STANDARD OF REVIEW

■ A preliminary injunction may issue if the plaintiff demonstrates irreparable harm, and either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Coca–*

*Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 314–15 (2d Cir.1982). We review an order denying a preliminary injunction for abuse of discretion, which may consist of "an error of law, an error of fact, or an error in the substance or form of the trial court's order." *Id.* at 315.

## DISCUSSION

The district court found no evidence of tampering, and no evidence that retail sale of the kits is unauthorized. We review these findings under the clearly erroneous standard. We are also confronted with two legal issues: whether Polymer can establish its claim based on (1) diversion of professional solutions into the retail market, and (2) alteration of the packaging. Under the circumstances of this case, we conclude that a claim for unfair competition or trademark infringement could be made out on either of these grounds. Because certain factual evidence relevant to these claims was not considered, we vacate the district court's denial of the preliminary injunction, and remand for further findings.

### A. *Application of Trademark Law*

■ As a general rule, trademark law[8] does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner. *NEC Electronics v. Cal Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir.), *cert. denied*, 484

---

ran admits handling the Care System, Starter Kit, and the Advance Care System.

5. The Boston Advance system contains the label: "For Dispensing by an Eye Care Professional Only." Polymer provides no cites to the appendix for the labels on the other kits. *See Polymer Brief*, at 9–10.

6. Mimran admits that the Advance Starter Kits do not always have tamper-evident seals. *See Mimran Brief*, at 13.

7. Defendant, Worldwide Scents, Inc., which is Mimran's largest purchaser, has admitted breaking down the professional kits, and selling them at retail with counterfeit packaging. Worldwide Scents is one of the defendants that has stipulated to an injunction. *See supra* n. 1.

8. Polymer alleges claims for trademark infringement under Section 32(1) of the Lanham

Act, 15 U.S.C. § 1114(1), as well as unfair competition under New York law. Only the federal claims were briefed. Section 32(1) of the Lanham Act provides, in part:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action....

15 U.S.C. § 1114(1) (1988). The test for trademark infringement under both the Lanham Act and the common law is the likelihood that the public will be confused about the source of the product. *See id.; American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 664 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). Thus, a distributor who resells trademarked goods without change is not liable for trademark infringement. *See* 2 J. Thomas McCarthy, *Trademarks and Unfair Competition,* § 25:11 (2d ed. 1984) (citing *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924) and *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947)). In addition, even repackaging of goods is not trademark infringement if it does not deceive the public or damage the mark owner's goodwill. *See Prestonettes,* 264 U.S. at 368, 44 S.Ct. at 351 (sale of repackaged cosmetics permitted provided statement disclosing origin is enclosed); *Champion,* 331 U.S. at 130, 67 S.Ct. at 1139 (sale of reconditioned spark plugs under original name permitted provided full disclosure made).

In this case, however, Polymer alleges that the Mimran defendants did not sell "genuine" products, and therefore are liable for trademark infringement. Polymer relies on several theories of liability: quality control; unauthorized distribution; and contributory infringement.

### 1. *Quality Control*

■ Polymer claims Mimran disregarded its quality control measures, presumably by breaking the packaging on the professional kits, and diverting the kits to the retail trade. Because the labelling on the professional solutions need not comply with FDA regulations, Polymer claims that distribution of professional solutions in the retail market subjects it to criminal penalties, and creates a public hazard.

This court has stated: "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Products Co. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d Cir.

1986), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987). Polymer cites several cases in which trademark infringement was found when the seller failed to maintain quality control standards established by the trademark owner. *See, e.g., El Greco,* 806 F.2d at 395 (when certificate of inspection is integral part of plaintiff's quality control effort, resale without certificate infringes trademark); *Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104, 107 (4th Cir.1991) (defendant infringed Shell trademark by marketing bulk oil according to its own and not Shell's quality control standards); *Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.,* 816 F.2d 68, 75 (2d Cir.) (Cardamone, J., concurring) (territorial restriction preventing United States sale of Cabbage Patch dolls with Spanish-language instructions is quality control measure; sale of dolls in United States infringes trademark), *cert. denied,* 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987); *Adolph Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131, 135–36 (D.Colo.1980) (distribution of plaintiff's beer without regard to quality control standards is trademark infringement). Under this line of cases, a plaintiff may prevail even though the goods have not deteriorated. *El Greco,* 806 F.2d at 395 ("the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain").

The district court found that Polymer could not recover under a quality control theory because there was no evidence that defendants "break the tamper-resistant seal, or in any way alter the packaging." A. 995. It appears that the district court did not focus on certain evidence in the record. Polymer submitted the declarations and deposition testimony of two private investigators who observed one of Mimran's employees breaking the packaging on the professional kits, and separating the contents.[9] Polymer also submitted in-

---

**9.** Steven Iken, a private investigator hired by Polymer, went to Mimran's warehouse in Brooklyn, New York. While at the warehouse on September 11, 1991, he observed:

A woman dumping out shipping cartons containing plaintiff's care systems onto a large

table and dividing out the contents; [t]he woman then packed the separate bottles of lens care solutions found in plaintiff's care systems into plain cardboard cartons; and [t]he woman flattened the original package and discarded same in a large trash barrel.

voices that show sales of individual solutions to a retailer, Vision Express. Since Mimran testified that he purchased kits only, sale of individual solutions is circumstantial evidence that Mimran disassembles the kits. Finally, Polymer submits a photograph depicting the garbage container outside the Mimran warehouse, which holds discarded packaging from lens care solutions of Polymer's competitors. No Boston packages appear, but Polymer claims the photograph is circumstantial evidence that Mimran breaks down the kits.[10]

On remand, the district court should consider all evidence relevant to the quality control theory. To prevail, however, Polymer must show more than repackaging. It must establish that repackaging interfered with its quality control efforts.

### 2. *Unauthorized Distribution*

■ Polymer also argues that retail distribution of professional solutions was neither intended nor authorized. A distributor's failure to observe a restrictive condition on the type or class of customers with whom it may deal can constitute trademark infringement, but more is required than unauthorized sales standing alone. *H.L. Hayden Co. v. Siemens Medical Sys.*, 879 F.2d 1005, 1023 (2d Cir.1989); *see generally* 2 Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies*, § 16.16 (4th ed. 1982); *McCarthy, Trademarks and Unfair Competition*, § 25.11.[11] The element of consumer confusion must also be present. *See Hayden*, 879 F.2d at 1023–24; *Original Appalachian*, 816 F.2d at 72–73. We deemed this

requirement satisfied in *Original Appalachian*, in which Cabbage Patch dolls manufactured in Spain for distribution there were imported and distributed in the United States accompanied by Spanish-language adoption papers and birth certificates, *id.* at 70, resulting in the inability of purchasers to effect "adoptions" of the purchased dolls. *Id.* at 73. *Clairol, Inc. v. Boston Discount Ctr., Inc.*, 608 F.2d 1114, 1120 (6th Cir.1979), a diversity action in which the facts are similar to the case at bar. In *Clairol,* defendant sold to the general public "salon" products that were not labelled or packaged in accordance with FDA regulations. *See id.* at 1116–17. The court found that sale of salon products to the public without further instructions, labelling or other protections was unfair competition under Michigan law. *Id.* at 1120–21. Other courts faced with similar facts have reached the same result. *See Clairol, Inc. v. Carlton Drug, Inc.*, 27 A.D.2d 652, 278 N.Y.S.2d 177 (1st Dept. 1967) (citing *Clairol, Inc. v. Peekskill Thrift Drug Corp.*, 25 A.D.2d 496, 267 N.Y.S.2d 476 (1st Dept.1966)) (retail sale of professional bottles with instructional materials unlike contained in retail bottles violates New York law); *Clairol, Inc. v. Cosmetics Plus*, 130 N.J.Super. 81, 325 A.2d 505 (1974) (reaching same result under New Jersey law).

The district court disregarded this theory of liability because it found no contractual provision preventing retail sale of the professional solutions, nor did it find any indication that the Mimran defendants had notice of Polymer's intent to restrict resale to

A. 67. Iken repeated this testimony at his deposition.
Stephen Petro, who handles corporate security for Polymer, accompanied Iken to the Mimran warehouse on September 11, 1991. He also testified that he saw a woman breaking down what appeared to be Boston Advance Care System Kits:
I observed this woman opening these kits, dumping the contents on a large table in front of her. Then taking the contents of the kits, which I have previously described [as] three bottles, a hard lens case, and sorting them into four separate boxes which were adjacent to her work area.
A. 836–37. Petro also testified that Mimran said he bought the systems in bulk, then broke them down and sold them individually. A. 841–43.

10. The Mimran defendants raise various evidentiary objections to this evidence, which the district court did not address. We decline to consider these evidentiary challenges until the district court has had an opportunity to consider the evidence and rule on the objections before it.

11. The question of whether such a restriction is permissible under the antitrust laws is not presented. In any event, we note that restrictions on resale have been upheld if reasonable. *Clairol, Inc. v. Boston Discount Center of Berkley, Inc.*, 608 F.2d 1114, 1123 (6th Cir.1979) (restriction on resale of salon products is reasonable restraint under antitrust laws).

eye-care professionals.[12] These findings leave some issues in doubt. First, the district court did not discuss whether the labelling on the professional kits, which restricted resale to eye-care professionals, was adequate notice to Mimran of Polymer's intent. Second, as long as Polymer's intent to restrict resale is clear, if the circumstances call for inquiry, Mimran may be liable for trademark infringement even without evidence that it knew of the restriction. *See El Greco*, 806 F.2d at 396 (defendant's claimed lack of knowledge of supplier's infringement is no defense).

In addition, Polymer suggests violations of FDA regulations resulted from both repackaging and unauthorized retail distribution of the professional solutions. The district court did not decide if defendants' conduct created such violations or whether such conduct constitutes trademark infringement under either the quality control or unauthorized distribution theories.

### 3. *Contributory Infringement*

■■■ Polymer argues that the Mimran defendants committed trademark infringement by selling to a wholesaler, Worldwide Scents, which has admitted repackaging with a counterfeit trademark. A distributor who intentionally induces another to infringe a trademark, or continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, is contributorially liable for any injury. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Although Mimran denied knowledge of Worldwide's counterfeiting, it would not have taken a great leap of imagination for Mimran to realize that, given their labelling, the professional kits would have to be repackaged before they could be sold at retail. The district court did not discuss this evidence.

12. Here, the district court considered the contract between Polymer and the defendant, International Contact Lens. It also considered correspondence from Polymer to its authorized man-

### B. *Abuse of Discretion*

The district court overlooked some relevant evidence in the record, and construed several theories of liability too narrowly. Thus, the court's conclusion that Polymer failed to establish either the likelihood of success on the merits or sufficiently serious questions going to the merits cannot stand. Although we decline to direct the district court to enter an injunction (*see Patton v. Dole*, 806 F.2d 24, 31 (2d Cir. 1986)), we remand to the district court for a new hearing and further findings. On remand, the district court should consider all relevant evidence in light of the legal theories discussed in this opinion.

### C. *Damages from Injunction Bond*

■■■■ The district court stated that it would award damages from the injunction bond because plaintiff had produced no evidence to support its allegations. It directed Mimran to submit a statement of damages, including contemporaneous time records. No further order has been entered. Plaintiff claims error. The courts of appeals have jurisdiction over interlocutory orders granting or refusing injunctions. 28 U.S.C. § 1292(a)(1) (1988). An order awarding interim fees during the course of a litigation is not an injunctive order subject to interlocutory appeal. *Hastings v. Maine–Endwell Central School Dist.*, 676 F.2d 893, 896 (2d Cir.1982) (interim order requiring party to pay attorney's fees is not injunctive order within meaning of § 1292(a)(1)); *United States v. Bedford Assocs.*, 618 F.2d 904, 915 (2d Cir.1980) (orders unrelated to substantive issues of litigation generally nonappealable under § 1292(a)(1)), *cert. denied*, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982). Thus, the court has no jurisdiction at this time to consider the issue of damages from the injunction bond. We note in passing, however, that an award from an injunction bond prior to final judgment is premature (*see Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049,

ufacturers, which indicates an awareness that professional solutions have been distributed to retailers and warns that steps have been taken to prevent such distribution.

1054–55 (2d Cir.1990); *American Bible Society v. Blount*, 446 F.2d 588, 594–95 (3d Cir.1971)), and, although the issue has not been decided in this circuit, other circuits have held that attorney's fees may not be recovered under Rule 65(c) of the Federal Rules of Civil Procedure. *See Matek v. Murat*, 862 F.2d 720, 734 (9th Cir.1988); *Fireman's Fund Ins. Co. v. S.E.K. Constr. Co.*, 436 F.2d 1345, 1352 (10th Cir.1971); 7 James W. Moore *et al.*, *Federal Practice*, para. 65.10 at 65–130–65–131 (2d ed. 1992). If, however, after final judgment the district court decides some award to defendants is appropriate, it should specify the basis for the award and make the required factual findings.

## CONCLUSION

The district court's decision denying a preliminary injunction is vacated and remanded for a new hearing and further findings consistent with this opinion.

KEARSE, Circuit Judge, dissenting in part:

I respectfully dissent from so much of the majority decision as vacates the district court's denial of a preliminary injunction. Though it would have been more helpful if the findings of the district court had been more explicit and complete, I cannot conclude that the court's denial of the motion by plaintiff Polymer Technology Corporation ("Polymer") for a preliminary injunction against the sale of Polymer products by defendant Emile Mimran to retailers was an abuse of discretion. *See generally Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 315 (2d Cir.1982) (ultimate question on appellate review of a district court's denial of a preliminary injunction is whether or not the court abused its discretion). I have both doctrinal and factual difficulties with the majority opinion.

First, I question the majority's suggestion that a manufacturer's unilateral intent to place a customer-class restriction on distribution, not embodied in any provision in its contracts with its distributors, will of itself suffice to support a claim of trademark infringement against a person who purchases from those distributors and resells to a class of customers to whom the manufacturer would prefer to sell directly. The majority provides no authority that supports this proposition. *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.1986), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987), cited in the majority opinion, does not support it because in that case there existed a contractual provision barring any sale of the goods absent satisfaction of a condition that in fact remained unfulfilled. Similarly, in *Original Appalachian Artworks v. Granada Electronics*, 816 F.2d 68 (2d Cir.), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987), there existed a contractual restriction limiting the sale of licensed products to within the distributor's licensed territory, and even then only to those purchasers who would agree not to use or resell the products outside the licensed territory. In the present case, the district court found that Polymer's contract with its distributors "contains no restriction concerning the identity of persons to whom the Kits may be sold." Though Polymer introduced postcontract correspondence in which it had sought unilaterally to enforce a customer limitation on its distributors, the court's finding that there was no such contractual restriction is not erroneous, much less clearly erroneous.

Second, the majority believes that the district court "did not focus on" evidence submitted by Polymer in the form of declarations and deposition testimony of detectives it had used to investigate Mimran and others. Majority opinion *ante* at 62. Whether the majority holds this belief merely because the district court did not mention the evidence or because the majority thinks the evidence so compelling that a injunction was required, I cannot agree.

Though the district court did not mention Polymer's detectives' statements and stated that there was no evidence to support the claim of tampering, I am unable to conclude that the court was unaware of the evidence. The papers submitted in support of the motion for a preliminary injunction

included the declarations and deposition testimony that the majority says the district court did not consider. Further, following the court's denial of the motion, Polymer moved for a stay pending appeal, pointing out that the court had said there was no evidence of tampering and specifically calling the court's attention to the detectives' statements. The district court appeared to agree with defendants that Polymer was merely rehashing evidence presented in support of the injunction motion, and I do not see how we can conclude that the court was unaware of this evidence. I interpret the court's statement that Polymer "produced no evidence to support the claim that defendants either break the tamper-resistant seal, or in any way alter the packaging of its product," as meaning that in the court's view Polymer had produced no credible or sufficiently probative evidence to support its claim.

Further, there was a considerable amount of evidence in the record to lead the district court to the conclusion that the statements by Polymer's investigators, alleging that they had seen Mimran employees tampering with the packaging of Polymer's products, were not sufficiently credible to warrant the granting of an injunction against Mimran. For example, although, as quoted by the majority *ante* at n. 9, Polymer's investigator Stephen Petro testified at deposition that on September 11, 1991 he had seen a Mimran employee opening Polymer kits and removing the contents and putting them into different boxes, Petro had previously submitted a declaration in support of Polymer's motion for a temporary restraining order in which he described his September 11 visit to Mimran's warehouse but had not mentioned such observations. He had no explanation for why he had not. Such a discrepancy alone would suffice to allow a district court to deem the deposition testimony insufficiently credible to warrant an injunction.

Further, the physical evidence did not support the detectives' claims. Polymer's private investigator, Steven Iken, testified at his deposition that he and investigators he supervised had made 6–10 "garbage pulls" in order to search through Mimran's garbage; they never found any Polymer packaging. They also had photographed Mimran's garbage; no Polymer packaging was revealed in the pictures. In addition, Petro claimed to have had an undercover conversation with Mimran in which the latter stated that he "bought the systems in bulk and then broke them down and sold them individually," and that he could provide Petro with individual solutions from the kits. Confirmation of that claim could have been presented to the court if Petro had simply purchased such an individual solution from Mimran. He chose not to provide that substantiation by making such a purchase.

Given the record as a whole, it was well within the bounds of the district court's discretion to conclude that Polymer's investigators' allegations and characterizations were insufficient to require the court to exercise its equitable power to enjoin Mimran from distributing Polymer products.

Finally, several other facets of the record are noteworthy. Petro conceded that he was aware of no evidence of any tampering by Mimran with the solution in any of Polymer's bottles. Iken admitted that though he had discovered counterfeiting by a company called Worldwide Scents, Inc. (*see* majority opinion *ante* at n. 7), he never uncovered any connection between that counterfeiting and Mimran. Several defendants other than Mimran conceded that they had engaged in counterfeiting; those defendants have been enjoined. As to Mimran, the court found that the evidence before it did not suggest that there was any threat to public health or safety such as to justify invocation of the court's equitable powers. Lastly, any notion that Polymer's goodwill was jeopardized by Mimran's sale of the professional kits to retailers because of the kits' sketchy ingredient disclosures is belied by the district court's finding, supported by Polymer's acknowledgement, "that the description of ingredients on the Kits is almost identical to, if not more detailed than, the description of the ingredients listed on" certain of Polymer's own retail packages.

On this record, I cannot agree with the majority that the denial of a preliminary injunction against Mimran was an abuse of discretion.