United States Court of Appeals,

Fifth Circuit.

No. 91-4457.

MATRIX ESSENTIALS, INC., Plaintiff-Counter-Defendant, Appellant-Cross-Appellee,

v.

EMPORIUM DRUG MART, INC., OF LAFAYETTE, d/b/a Drug Emporium,

and

Emporium Drug Mart, Inc., of Shreveport, d/b/a Drug Emporium, Defendants-Counter Claimants, Appellees-Cross-Appellants.

April 19, 1993.

Appeals from the United States District Court for the Western District of Louisiana.

Before GARWOOD and EMILIO M. GARZA, Circuit Judges.[*]

GARWOOD, Circuit Judge:

Matrix Essentials, Inc. (Matrix) appeals a summary judgment rendered against it by the district court on . . . . . . . . . . . claims of trademark infringement and unfair competition stemming from the unauthorized sale of its products by defendant-appellee-cross-appellant Emporium Drug Mart, Inc., (Emporium). 756 F.Supp. 280. Emporium cross-appeals the summary judgment rendered against it on its antitrust claims against Matrix. Finding no error below, we affirm both judgments.

**Facts and Proceedings Below**

Matrix is a manufacturer of specialty hair-care products that are normally sold only in hair-cutting salons. The products are labeled with Matrix's registered trademark and are often (but not always) marked with a label stating that they are intended to be sold only in professional salons. Matrix distributes its products through wholesale distributors who are contractually bound to resell Matrix products only to licensed cosmetologists.

Matrix intends that its products either be used by licensed cosmetologists on their clients in

[*]Judge John R. Brown was on the panel that heard oral argument in this case, but passed away before the decision was entered, and the case is accordingly decided by a quorum. *See* 28 U.S.C. § 46(d).

a salon, or be sold by a licensed cosmetologist to a consumer. Matrix also intends that such consumer sales be accompanied by a consultation so that the consumer may be directed to the particular Matrix product appropriate for the consumer's hair and scalp condition. To this end, Matrix spends several millions of dollars per year training cosmetologists in the use and sale of Matrix products. Matrix does not, however, monitor or otherwise act to attempt to insure that consumer sales of Matrix products happen only after consultation.

Emporium is the owner of two independent, high-volume, low-mark-up, over-the-counter retail drug stores. In 1988 Emporium procured and stocked on its shelves a large quantity of Matrix products with Matrix labeled instructions for home use. These products bore the Matrix trademarks and were the same products available in salons. Many of the Matrix products stocked by Emporium bore the labels "Sold Only in Professional Salons," or "Guaranteed Only When Purchased in Professional Salons."

Upon learning of Emporium's sale of Matrix products to consumers, a group of local salons complained to Matrix about competition from Emporium. Matrix's local wholesale distributor also complained. In July 1989, Matrix authorized its local distributor to buy out Emporium's stock of Matrix products at Matrix's expense. Emporium was able to restock its shelves with Matrix products, however, and Matrix subsequently demanded that Emporium cease its unauthorized sales of Matrix products.

When Emporium refused, Matrix on November 7, 1989, filed this suit in the United States District Court for the Western District of Louisiana alleging trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and unfair competition under the Louisiana Unfair Trade Practices and Consumer Protection Law, L.S.A. § 51:1401.[1] Emporium filed a counterclaim alleging that Matrix and its distributors and salon retailers had engaged in an unlawful conspiracy to restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

Each party moved for dismissal or summary judgment of the other's claims. The district court

---

[1]Matrix also sought relief for common law trademark infringement and unfair competition, among other claims. These were dismissed under Rule 12(b)(6) and Matrix does not challenge or appeal the dismissal of these claims.

granted Matrix's motion for dismissal or summary judgment as to Emporium's antitrust claims on December 13, 1990. Subsequently, Matrix presented evidence regarding its salon education program and sales/distribution network, including the deposition testimony of Matrix's president and CEO. The district court granted Emporium's motion for summary judgment on February 15, 1991. Both parties filed timely notices of appeal.

## Discussion

I. *Trademark and Unfair Competition Claims.*

There are no disputed issues of material fact here. Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Matrix bears the burden of proof here. Taking the evidence in the light most favorable to Matrix, the non-moving party, *Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990), Emporium purchased Matrix products and sold them without authorization by Matrix. Matrix has made no showing or allegation that the products are counterfeit, or that Emporium has tampered with them in any way. Matrix acknowledges that, at least physically, the products sold by Emporium are of the same origin and quality as those sold by salons.

Matrix bases its claim on two theories. The first theory is that Emporium is not selling "genuine" Matrix products, because it is selling them without the professional consultation that is supposed to be available when a consumer chooses a Matrix product to purchase. Thus, according to Matrix, Emporium is circumventing an important quality control function of Matrix's distribution system. The product that an Emporium customer buys, without this potential assistance in selection, is therefore not the full, complete, and genuine Matrix product.

Matrix's second theory is that by stocking Matrix products, Emporium is deceiving the public into believing that Matrix has authorized Emporium to do so. This, according to Matrix, "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of Emporium with Matrix "or as to the origin, sponsorship, or approval" by Matrix of Emporium's

sale of Matrix products.  15 U.S.C. § 1125(a)(1).

Because liability under the Lanham Act is predicated on the use of a trademark in a way that is "likely to cause confusion," *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1185 (5th Cir.1980) (quoting 15 U.S.C. § 1114(1)(a), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981)), consumer confusion must be the linchpin of our analysis in this case.  As recognized by the Fourth and Ninth Circuits (as well as various district courts), the general rule is that "trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent."  *Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104, 107 (4th Cir.1991) (citing *NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506 (9th Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987)).

In *Shell, supra,* the defendant was prohibited from selling bulk oil under Shell trademarks because the distributor did not observe the strict tank and line cleaning requirements that Shell required of its authorized distributors.  These requirements insured that pure Shell-trademarked oil was not subjected to residue impurities in the tanks and lines of the distributors as it made its way to customers.  *Shell, supra,* 928 F.2d at 107.

In *El Greco Leather Products Co., Inc. v. Shoe World, Inc.,* 806 F.2d 392 (2d Cir.1986), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987), the defendant, a discount shoe retailer, bought shoes bearing the plaintiff's trademark from a Brazilian manufacturer that had manufactured the shoes pursuant to the plaintiff's order.  The manufacturer sold the shoes to the defendant after the plaintiff cancelled the order because of late delivery.  The Second Circuit held that, because the shoes imported by the defendant had not undergone the careful quality inspection by the plaintiff's Brazilian agent that was normally required by the plaintiff before it sold its shoes in the United States, the shoes imported by the defendant were not "genuine."

Similarly, in *Adolph Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131 (D.Colo.1980), the court found that the Coors beer sold by the defendant distributor was not "genuine" Coors beer (though it had been manufactured and labeled by Coors) because the defendant, an unauthorized distributor, did not maintain the careful refrigeration requirements in transporting

and storing the beer mandated by Coors. Coors beer contained no preservatives, and if allowed to sit unrefrigerated for long periods of time could deteriorate. The district court therefore determined that the beer sold by the defendant was therefore not "genuine" Coors beer. Id. at 134-137.

Not all value-added functions dictated by the manufacturer are required to insure a "genuine" product, however. In *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005 (2d Cir.1989), the defendant imported and sold through its catalogue dental equipment manufactured by the plaintiff and bearing the plaintiff's trademarks. The defendant did not install the equipment sold, though the plaintiff required its authorized distributors to install the equipment they sold. The plaintiff argued that because its "product" was not merely what it manufactured, but rather what it manufactured and authorized its dealers to install, the defendant was not selling a genuine product. The Second Circuit rejected this contention, ruling that so long as customers knew that what they purchased from the defendant was only the plaintiff's manufactured product and did not include installation, no one was deceived and the product was genuine. *Id.* at 1022-24.

A similar result was reached in *NEC Electronics, supra,* where the Ninth Circuit found that computer chips manufactured by NEC in Japan and imported by the defendant were genuine products, though NEC's American subsidiary owned the trademark on the computer chips. The court found that "the mark "NEC' on [defendant's] products truly designates the chips as having been manufactured under the control of NEC-Japan ..." and that "because NEC-Japan and NEC-USA are commonly controlled, there is no danger to the latter in being unable to control the quality of the former's products." *NEC Electronics, supra,* 810 F.2d at 1510.

Here, Matrix claims that the products sold by Emporium, without the potential for concurrent consultation or supervision by a licensed cosmetologist, were not "genuine" products. Matrix argues that absent such a consultation, an unwary customer is likely to choose a Matrix product that is not formulated for his or her hair or scalp condition and thereby obtain unsatisfactory results, thus damaging Matrix's goodwill.

The critical element that is missing from Matrix's argument and from the facts of this case, however, is the element of consumer confusion. The common thread in all the above cited cases

where trademark infringement was found is that each involved some defect (or potential defect) in *the product itself* that the customer would not be readily able to detect. The oil, shoes, and beer from *Shell, El Greco,* and *Coors* all contained or could potentially contain a latent product defect due to the unauthorized distributor's failure to observe the manufacturer and mark owner's rigorous quality control standards. Most importantly, a consumer would not necessarily be aware of the defective condition of the product and would thereby be confused or deceived.

Such was not the case with the medical equipment in *Siemens,* the computer chips in *NEC,* or the hair-care products here. No customer who went to Emporium to buy Matrix products was confused or deceived as to whether they were getting a cosmetologist's consultation with their purchase. Though Matrix claims that an uninformed customer could mistakenly have bought the wrong product for his or her hair or scalp conditions and that this could potentially have damaged Matrix's consumer goodwill, we will not find a cause of action under the Lanham Act where, as here, there is no evidence of consumer confusion or deception. We decline to expand the reach of the Lanham Act in a way that makes Matrix's complaint actionable thereunder.

We further note that Matrix's claim that having its products sold through Emporium would erode its goodwill does not even rest on a sound factual base. The evidence before the district court clearly establishes that, although Matrix spends a great deal of time and money educating cosmetologists in the use and sale of its products, it does not require, monitor, or otherwise attempt to insure that consumers who purchase Matrix products in salons are assisted by a cosmetologist in selecting the proper Matrix product. Matrix products may be purchased in a salon either with or without a cosmetologist's advice. We cannot ignore the fact that if a pre-sale consultation is a necessary part, in Matrix's opinion, of a "genuine" Matrix product, then many of the sales that occur in salons are not sales of "genuine" Matrix products either. Thus, Matrix's use of professional hair care salons as its exclusive distribution channel seems more marketing-related than quality-related. This fact makes this case even more analogous to *Siemens* than to *Coors, El Greco,* or *Shell.*[2]

---

[2]Nor do we consider *Polymer Technology Corp. v. Mimran,* 975 F.2d 58 (2d Cir.1992), recently cited to us by Matrix, as persuasive authority for a contrary result here. There two distinct lines of contact lens care products were involved. One line was packaged for retail sale,

The second theory under which Matrix argues its case is that by stocking Matrix products, Emporium is violating 15 U.S.C. § 1125(a) by misleading consumers into believing that it is an authorized retailer of Matrix products and that Matrix condones the sale of its products through ordinary retail drugstores.  As with trademark infringement, the touchstone of a section 1125(a) unfair competition claim is whether the defendant's actions are "likely to cause confusion."

Here, Emporium's sale of Matrix products cannot cause confusion as to manufacture or sponsorship because the goods were manufactured and labeled by Matrix.  Rather, the underlying assumption relied upon by Matrix to support this second theory is that consumers assume when they see a product on a store shelf that the manufacturer meant for it to be there.  The alleged harm is that a customer seeing a Matrix product on an Emporium shelf will assume that Matrix has decided that salon consultation on the customer's choice of the appropriate Matrix product is unnecessary, since Matrix is allowing its products to be sold to the public in an environment where such consultation is not concurrently available.

Section 1125(a) states:

"Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

"(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

and contained Food and Drug Administration (FDA) required consumer labeling, warnings, and tamper-evident seals.  The other line was distributed to professionals such as ophthalmologists and optometrists;  the FDA regulations did not apply to this line and its packaging had not been submitted to the FDA for approval;  it was frequently distributed in bulk, with individual items not having the labeling or warnings, and sometimes not the tamper-evident seals, required by the FDA for items sold at retail.  *Id.* at 60-61.  The manufacturer and trademark owner, Polymer, claimed that the defendant sold professional kits at retail, and also broke them down and sold separately at retail the individual bottles of professional solutions.  The district court denied a temporary injunction.  On appeal, a divided Second Circuit panel remanded for reconsideration because the district court had apparently not considered evidence that the defendant broke the packaging on the professional kits and sold the individual items separately at retail.  The majority noted Polymer's claim "that distribution of professional solutions in the retail market subjects it to criminal penalties, and creates a public hazard."  *Id.* at 62.  The majority also stated, however, that on remand "Polymer must show more than its quality control efforts."  *Id.* at 63.  Here there is no repackaging and no alteration of the contents labeling, use instructions, or warnings;  nor is there any claim of FDA violation.  We further note in respect to the claim of unauthorized distribution, the *Mimran* majority, citing *Hayden,* stated that "[t]he element of consumer confusion must also be present."  *Mimran* at 63.  There is no such showing here.

connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....

"shall be liable in a civil action...."[3]

Though, as Matrix claims, a customer might well be confused as to whether Matrix believes a salon consultation is necessary in selecting its products, it is difficult to say that Emporium has made a "misleading representation of fact," which is the only language in the text of section 1125(a) that could possibly cover Emporium's acquisition and stocking of Matrix products. The parties have not directed this Court to any cases that have addressed this particular question.

The Ninth Circuit appears to have spoken to this issue in *NEC, supra,* when it said, "[o]nce a trademark owner sells his product, the buyer ordinarily may resell the product under the original mark without incurring *any trademark law liability.*" *NEC, supra,* 810 F.2d at 1509 (emphasis added). This language would seem to exclude liability for mere reselling under all sections of the Lanham Act, including section 1125(a), for infringement and unfair competition.

Affirmative misrepresentation, such as placing a plaintiff's trademark on the defendant's advertisements, is clearly a violation of section 1125(a), see *Trail Chevrolet, Inc. v. General Motors Corp.,* 381 F.2d 353 (5th Cir.1967). However, Matrix is not able to point to any authority holding that the unauthorized stocking of a trademark owner's products, without more, rises to the level of a "misleading representation of fact."

For example, Matrix cites *Stormor, A Division of Fuqua Industries, Inc. v. Johnson,* 587 F.Supp. 275 (W.D.Mich.1984), for the proposition that the unauthorized sale of trademarked products constitutes a violation of section 1125. However, in *Stormor,* the defendant not only engaged in unauthorized selling of the plaintiff's trademarked products, but also used plaintiff's

---

[3]Because section 1125(a) was substantially amended in 1988, the amendment taking effect after this action was filed, a threshold issue with regard to this second theory is whether to apply the pre- or post-amendment version of section 1125(a). Fortunately, the answer does not matter. Congress, in amending section 1125(a), intended merely "to codify the interpretation [pre-amendment section 1125(a) ] has been given by the courts." S.Rep. No. 515, 100th Cong., 2d Sess. 40, *reprinted in* 1988 U.S.Code Cong. & Admin.News 5577, 5603. *See McNeil—P.C.C., Inc. v. Bristol-Myers Squibb Co.,* 938 F.2d 1544, 1548 n. 1 (2d Cir.1991); *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 963-64 n. 6 (D.C.Cir.1990). We refer to the post-amendment text of section 1125(a) in this decision.

promotional literature stamped with defendant's name, and used the plaintiff's trademarks at defendant's trade show booth. *Id.* at 279.[4] Thus, there was evidence, apart from simply offering the plaintiff's products for sale, that the defendant actively misled its customers into believing that defendant was part of the plaintiff's authorized sales network. Such is not the case here.

We are not persuaded by Matrix's arguments to expand the reach of section 1125(a) to provide a cause of action merely for the unauthorized stocking and sale of a manufacturer's products. Absent more culpable conduct on the part of the seller, we are unwilling to find misrepresentation in the mere act of putting a manufacturer's product on one's shelf and offering it for sale. We therefore affirm the district court's grant of summary judgment in favor of Emporium on the trademark and unfair competition claims.[5]

II. *Antitrust Counterclaim.*

The district court's decision to grant summary judgment on Emporium's cross-claim is well-supported by existing antitrust law as articulated both by the Supreme Court and this Circuit. This issue is controlled by this Court's analysis in *Culberson, Inc. v. Interstate Elec. Co., Inc.,* 821 F.2d 1092 (5th Cir.1987), a case factually similar to this one. In *Culberson* this Court affirmed a district court's summary judgment ruling that a defendant-manufacturer's decision to prevent its distributors from selling to an unauthorized distributor was not a violation of section 1 of the Sherman Act. The manufacturer in *Culberson* had adopted a policy against subdistribution and transshipment after many dealer and distributor complaints that such practices were hurting their businesses. *Id.* at 1093.[6]

---

[4]*Cf. WCVB-TV v. Boston Athletic Ass'n,* 926 F.2d 42 (1st Cir.1991) (television station did not violate 15 U.S.C. §§ 1114 or 1125(a) in televising Boston Marathon using plaintiff's "Boston Marathon" trademark).

[5]Though nominally appealing a claim under the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-RS § 51:1401, Matrix makes no separate argument nor cites any cases construing that statute in its briefs to this Court. Further, the district court considered Matrix's section 51:1401 state law claims together with the Lanham Act claims. For these reasons we affirm, without separate discussion, the district court's grant of summary judgment with regard to Matrix's Louisiana law claims.

[6]On appeal, Emporium raises only conspiracy claims under section 1 of the Sherman Act.

Vertical restraints that do not deal specifically with price fixing are not *per se* illegal under the antitrust laws and are instead subject to the rule of reason. *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Here, there is no evidence of price fixing and we therefore subject Matrix's conduct to rule of reason review. Under the rule of reason, in order for Emporium's claim to survive a summary judgment motion, the evidence must tend to exclude the possibility that Matrix acted independently in restricting the distribution of its products. *See Culberson, supra,* 821 F.2d at 1093.

It is undisputed that ever since a time long before the events at issue Matrix had a consistent policy of selling its products only through salons because this assured the concurrent availability of cosmetologist consultation, either, as Matrix has asserted, to enhance appropriate product selection, or to enhance product public image. That this policy is not enforceable against Emporium under the Lanham Act does not mean that it fails to believably explain Matrix's having independently both refused to sell its products to Emporium and attempted to insure that its distributors and retailers did not do so either. The fact that Matrix had such a policy long before it received complaints from salons and distributors about Emporium's selling its products makes the case for affirming summary judgment here even stronger than it was in *Culberson.*

Emporium bases its claim on the fact that a group of salons and distributors first noticed that Emporium was stocking Matrix products and that they notified and requested action from Matrix. We held in *Culberson,* however, that distributor complaints are to be expected in a situation such as this one and are not by themselves indicative of an illegal horizontal conspiracy. *Id.*

Emporium's final complaint, that Matrix violated the antitrust laws by filing this lawsuit, is similarly unfounded. This Court stated in *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358 (5th Cir.1983), that:

> "A litigant should enjoy petitioning immunity from the antitrust laws so long as a genuine desire for judicial relief is a significant motivating factor underlying the suit. This criterion takes account of the mixed motives that usually actuate human conduct, yet requires that good faith in seeking the protection of the court be a substantial factor." *Id.* at 1372.

There is no evidence that Matrix filed its suit solely as a "sham." Matrix is therefore entitled to

protection from antitrust liability for filing its action against Emporium.

## Conclusion

Matrix's trademark infringement and unfair competition claims stretch existing legal principles in this area too far, and fail to show an actionable claim under the law as it exists today. Furthermore, we decline to expand existing law to accommodate Matrix's perceived injuries. Emporium's antitrust claim is foreclosed by this Court's precedent. The present appeals demonstrate no reversible error in the district court's granting of both motions for summary judgment. The district court's judgment is therefore

AFFIRMED.