**BALLET MAKERS, INC., Plaintiff,**

v.

**The UNITED STATES SHOE CORPORATION and J.P. Manning, Inc., Defendants.**

**No. 85 Civ. 8622(MEL).**

United States District Court, S.D. New York.

May 5, 1986.

Edward A. Meilman, Ostrolenk, Faber, Gerb & Soffen, New York City, for plaintiff; Mark Garscia, Lawrence Freedman, Koenig, Ratner & Mott, P.C., New York City, of counsel.

Brumbaugh, Graves, Donohue & Raymond, New York City, for defendant The U.S. Shoe Corp.; Joseph D. Garon, Robert Neuner, Doreen J. Leavens, of counsel.

John P. Reiner, Townley & Updike, New York City, for defendant J.P. Manning, Inc.; David O. Simon, of counsel.

LASKER, District Judge.

This litigation concerns the use of the trademark CAPEZIO.[1] Ballet Makers, Inc. ("Ballet Makers"), a New York corporation which manufactures dance and recreational footwear and accessories, was originally established as a manufacturing division of Capezio, Inc. In 1964 Ballet Makers was spun off and given the right to sell and manufacture certain CAPEZIO products. In 1973, Capezio, Inc., then experiencing financial difficulties, sold the title to the CAPEZIO trademark, which, in December of that year, came to be owned by United States Shoe Corporation ("U.S. Shoe"), a corporation established under the laws of Ohio. On February 13, 1974 U.S. Shoe and Ballet Makers entered into an agreement granting Ballet Makers a license to sell and distribute certain CAPEZIO products ("the 1974 agreement"). Ten years later, U.S. Shoe entered into another licensing agreement, this time with J.P. Manning, Inc. ("Manning"), a New York corporation ("the Manning agreement"). Ballet Makers' claim that the Manning agreement encroaches on Ballet Makers' rights under the 1974 agreement lies at the heart of this litigation. Specifically, Ballet Makers alleges violations of the Lanham Act, §§ 32 and 43(a), 15 U.S.C. §§ 1114 and 1125(a) respectively, and breach of contract. It seeks damages as well as injunctive relief. Jurisdiction is asserted under 15 U.S.C. § 1121, 28 U.S.C. § 1338, 28 U.S.C. § 1332 and based upon the doctrine of pendant jurisdiction.

\* \* \* \* \* \*

Under the 1974 agreement Ballet Makers has

> the exclusive, nontransferrable license to use the trademarks "CAPEZIO" solely in connection with the manufacture, sale and distribution of [dance and recreational footwear and accessories, including, but not limited to "tights"] through dance footwear outlets.

On June 6, 1983 the parties amended the 1974 license to provide, among other things, that

> Both parties agree that, at present, the U.S. Shoe licensed CAPEZIO Concept Stores in shopping malls are, in fact, "dance footwear outlets" as defined in the [1974] Agreement.

The Manning agreement, on the other hand, grants Manning

---

1. According to the complaint, there are several registrations of the trademark, "including but not limited to Reg. Nos. 662,280 and 893,346."

Complaint at ¶ 7. "CAPEZIO," as used throughout this decision, refers to all of the relevant registrations.

the exclusive and non-transferable right and license ... to use the trademark "CAPEZIO" ... on and in connection with the manufacture, distribution and sale of designated articles of hosiery [including girls and womens tights].

On November 15, 1985 Ballet Makers moved for a preliminary injunction restraining the defendants from "interfering with or injuring plaintiff's exclusive rights in the CAPEZIO trademark or the goodwill associated therewith." In response, the defendants moved to dismiss the complaint. In the alternative, U.S. Shoe moved for summary judgment.

After an evidentiary hearing, Ballet Makers' motion for a preliminary injunction was denied. In addition to finding (1) that Ballet Makers had not established irreparable harm; (2) that the balance of hardship did not tip decidedly in favor of the plaintiff; and (3) that the equities favored denying the injunction, we concluded that the defendants' motions raised serious questions concerning federal jurisdiction under the Lanham Act which required further consideration. *See* Transcript at 2 (Dec. 3, 1985 hearing on the preliminary injunction). Having further examined the issues we hold that Ballet Makers has failed to state a cause of action for either unfair competition, 15 U.S.C. § 1125(a), or infringment, 15 U.S.C. § 1114(a).

## I. Lanham Act

Ballet Makers alleges that Manning's use of the CAPEZIO mark "in connection with the Licensed Products, e.g. dance footwear and dance accessory items, is likely to cause confusion and mistake and to deceive and constitutes trademark infringement in violation of 15 U.S.C. § 1114." Complaint at ¶ 20. In addition, Ballet Makers asserts that

Manning has caused its goods, and U.S. Shoe has caused or permitted Manning's goods, to enter into commerce that may be regulated by Congress and has made false representations and descriptions and false designations as to the origin and quality of the goods by the use as aforesaid of the "CAPEZIO" name and mark and has also made false designations and representations that said goods of Manning are somehow sponsored by, originate with or are connected with Ballet Makers and false descriptions and representations as to the source of defendants' business and to its relationship with Ballet Makers and its goods.

*Id.* at ¶ 28. Such conduct, Ballet Makers asserts,

[is] likely to cause confusion and mistake and to deceive actual and prospective purchasers as to the source, quality, sponsorship or affiliation of said products of Manning, all in violation of § 43(a) of the Lanham Act, as amended, 15 U.S.C. § 1125(a).

*Id.* at ¶ 29.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), proscribes "false designation of origin or any false description or representation" in connection with goods sold in interstate commerce.[2] The narrower question of infringement, on the other hand, is defined as the use of the mark "without the consent of the registrant," 15 U.S.C. § 1114(1), and relates to the right of the trademark owner to use its mark to

---

2. 15 U.S.C. § 1125(a) states:

§ 1125. False designations of origin and false descriptions forbidden

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

distinguish its product.[3] "As has often been observed, the law of trademark infringement is but a part of the law of unfair competition," *American Footwear Corporation v. General Footwear Company,* 609 F.2d 655, 664 (2d Cir.1979) (*citing Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916)), and the touchstone of liability is the same for both actions, namely, a likelihood of consumer confusion. *See id.; Mushroom Makers, Inc. v. R.G. Barry Corporation,* 441 F.Supp. 1220, 1225 (S.D.N.Y.1977) (Weinfeld, J.), *aff'd,* 580 F.2d 44 (2d Cir.1978). Moreover, where, as here, plaintiff's claims for infringement and unfair competition are based upon virtually the same behavior, *i.e.,* the alleged improper use of the CAPEZIO mark, the evidence needed to prove confusion is also the same. *See Exquisite Form Industries, Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 414 (S.D.N.Y. 1974) ("Where, as here, the § 43(a) [unfair competition] claim is coupled with a claim of trademark infringement, the nature of the proof required under this statute may be simply stated. The plaintiff must establish that 'the defendant's goods are likely to be thought to have originated with, or to have been sponsored by, the true owner of the mark.' *Societe Comptoir De L'Industrie v. Alexander's Department Stores, Inc.,* 299 F.2d 33 (2d Cir.1962)."). Accordingly, although the defendants' argument is restricted to the proposition that U.S. Shoe's sponsorship of the disputed goods will defeat the unfair competition claim, it should be noted that failure to establish confusion of source will defeat a purported claim of infringement as well.

Defendants argue that Ballet Makers has failed to state a cause of action for unfair competition because U.S. Shoe is the sole source of all CAPEZIO products and that Manning's goods, labeled CAPEZIO, therefore do not state a false source of origin. They contend further that under such circumstances there can be no consumer confusion. Ballet Makers answers that an offer or sale of CAPEZIO tights by anyone other than Ballet Makers constitutes a false representation and description and a false designation of origin and quality because U.S. Shoe conveyed to Ballet Makers the exclusive right to sell CAPEZIO tights in the CAPEZIO Concept stores and other dance footwear outlets.

This action raises the question whether confusion of source can exist when the disputed goods bear a label which has been authorized by the owner of the mark in issue, who has also licensed another manufacturer to use the same label. The proposition presented is a puzzling one, demanding resolution of the conflict between the rights of a licensee whose efforts have made the trademarked product successful on the one hand, and the registrant's exclusive rights in its mark on the other hand.

Whether a licensee may maintain an unfair competition action against another licensee who is selling the trademarked products with the registrant's approval recently was raised before us in *Burma-Bibas, Inc. v. Excelled Leather Coat Corporation,* 584 F.Supp. 1214 (S.D.N.Y.1984).

---

**3.** 15 U.S.C. § 1114 states in relevant portion:
§ 1114. Remedies; infringement; innocent infringement by printers and publishers
(1) Any person who shall, without the consent of the registrant—
  (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
  (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.
shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

In that case, Burma Bibas, Inc. ("Burma"), a manufacturer of men's apparel that had an exclusive license from Oleg Cassini, Inc. ("Cassini") to manufacture leather and suede jackets, sued Cassini and Excelled Leather Coat Corporation ("Excelled") for unfair competition, infringement and breach of contract because Cassini had also licensed Excelled to manufacture leather and suede jackets. Excelled moved to dismiss Burma's unfair competition claim, arguing, like the defendants here, that the designation and representations made by Excelled could not be false, and that therefore there could be no confusion because Cassini had authorized Excelled's sale and distribution of the Cassini jackets and coats. In contrast to the present case, however, Burma responded that it was "the practice in the menswear trade for quality products under a designer name to be manufactured by a *single source* manufacturer pursuant to an exclusive licensing agreement." *Id.* at 1216 (emphasis supplied). Moreover, Burma's amended complaint set forth specific instances of confusion on the wholesale customer level which, purportedly, was created by Excelled's showing the Cassini products line. "Excelled," Burma argued, "by merely labeling its products as an Oleg Cassini item, falsely represents to the public that it is the sole source of leather jackets and coats bearing the Oleg Cassini trademark and ... the representation creates confusion in both the retailing and consumer markets." *Id.* We concluded that under such circumstances "it [did] not appear beyond [a] doubt that [Burma could] prove no set of facts in support of its claim which would entitle it to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46 [78 S.Ct. 99, 101–102, 2 L.Ed.2d 80] (1957)." *Id.* at 1217. Accordingly, Excelled's motion was denied.

Burma's assertions that Cassini menswear was exclusively and inextricably tied to Burma as the manufacturer, and the specific factual allegations supporting confusion significantly distinguish that case from this. Accordingly, *Burma-Bibas* does not provide compelling authority supporting the denial of the defendants' mo-

tion to dismiss Ballet Makers' Lanham Act claims. Moreover, as discussed below, recent developments in the area of "genuine products" raise a question as to the vitality of the holding in *Burma-Bibas*.

\* \* \* \* \* \*

The Court of Appeals for this Circuit has not ruled on whether as a matter of law "confusion" may be found to exist where the owner of the mark licenses more than one licensee to use its mark on the licensees' goods. However, it has at least twice expressed skepticism as to the proposition. For example, in *DEP Corporation v. Interstate Cigar Company, Inc.*, 622 F.2d 621 (2d Cir.1980), plaintiff, who was licensed as the exclusive United States distributor of "Pears" soap, sued defendant for trademark infringement for selling Pears soap in the United States. The Court of Appeals held that DEP did not have standing to sue for infringement. Specifically reserving the question whether "a trademark infringement action may be appropriately brought against one who is selling goods which are genuine in origin and create no confusion as to their source," *id.* at 622 n. 1, the Court nevertheless remarked: "It does appear anomolous in any event that a trademark infringement action would lie here where the soap in question is genuine and not spurious." *Id.*

More recently, in *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42 (2d Cir.1983), the Court of Appeals expressed similar doubts regarding the soundness of such a proposition. The *Masel* defendant appealed from the district court's grant of a preliminary injunction enjoining Masel from distributing products bearing certain trademarks and from engaging in certain related activities. The issue before the district court was "whether an American company [BHMC], which is engaged on an exclusive basis in the business of importing and selling trademarked goods of foreign manufacture under United States trademark rights owned by it, may enjoin another's [Masel's] unauthorized, competitive sale in the United States of the same identically trademarked goods,

which were made and placed in the stream of international commerce by the foreign manufacturer [Mamiya Co.], who did not intend that such goods be sold here." *Id.* at 45. Focusing on "the fundamental question of trademark law, whether or not the defendant's use of the MAMIYA marks on medium format photographic equipment is likely to cause confusion with the plaintiff's use of the mark," *id.*, the district court concluded that there was a substantial likelihood of confusion.

The Court of Appeals vacated the injunction, commenting:

> On the basis of the present record, irreparable injury may well not be present herein since there would appear to be little confusion, if any, as to the origin of the goods and no significant likelihood of damage to BHMC's reputation since thus far it has not been shown that Masel's goods, which have a common origin of manufacture with BHMC's goods, are inferior to those sold by BHMC and are injuring BHMC's reputation. ... Thus, less drastic means would appear to be available to avoid the claimed confusion.

*Id.* at 46.

It appears that only one Circuit has reached the "genuineness" issue,[4] and then only on a question of state law. In *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corporation*, 707 F.2d 1054 (9th Cir.1983), the Ninth Circuit Court of Appeals, relying on the dicta in *DEP* referred to above, held that the unauthorized sale of genuine goods does not give rise to a cause of action for common law infringement. In *Monte Carlo*, Daewoo Industrial Company, Ltd. agreed to manufacture men's shirts under the Monte Carlo label and according to Monte Carlo's specifications. When the shirts were not delivered until after the Christmas sales season, however, Monte Carlo refused to accept delivery. Consequently, Daewoo's United States subsidiary purchased the shirts and began selling them.

The District Court granted summary judgment dismissing the infringement claim, holding that "[t]he sale of the Monte Carlo shirts with the Monte Carlo labels intact could not as a matter of law deceive or confuse the public concerning the source and origin of the shirts." *Id.* at 1056. The Court of Appeals affirmed:

> No such confusion was possible in this case. The goods sold by Daewoo were not imitations of Monte Carlo shirts; they were the genuine product, planned and sponsored by Monte Carlo and produced for it on contract for future sale. The shirts were not altered or changed from the date of their manufacture to the date of their sale. Their source was Monte Carlo.... *Cf. DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621, 622 n. 1 (2d Cir.1980) [parenthetical].

*Id.* at 1058.

Although *Monte Carlo* involved (California) common law infringement, courts in this Circuit have relied upon the Ninth Circuit analysis in federal trademark cases. For example, the plaintiff in *El Greco Leather Products Co., Inc. v. Shoe World, Inc.*, 599 F.Supp. 1380 (E.D.N.Y.1984), the owner of the trademark "CANDIES," engaged a foreign manufacturer to produce its product (shoes) but later cancelled its order due to what the district court found to be late delivery. Trial on the merits was consolidated with plaintiff's motion for a preliminary injunction to bar the sale of the late-delivered goods. Following *Monte Carlo* and relying on *DEP*, the court denied the motion for a preliminary injunction, holding that the absence of the trademark owner's authorization to sell the goods did not support an infringement action since the use of the mark had been sponsored by the plaintiff. *Id.* at 1393.

Similarly, the court in *Diamond Supply Company v. Prudential Paper Products Co.*, 589 F.Supp. 470 (S.D.N.Y.1984), concluded after trial that there was no possibility of confusion as to the source of goods because the use of the plaintiff's mark had

---

**4.** The parties have not cited *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corpora-* *tion,* 707 F.2d 1054 (9th Cir.1983), nor any of the decisions which discuss it.

been authorized by it and held that plaintiff had not met its burden of proving its federal claim for unfair competition.

\* \* \* \* \* \*

The concept of "confusion" in trademark law refers to "the public's belief that the mark's owner sponsored or otherwise approved the use of the trademark." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979).[5] Although not explicitly contained in the above definition, the statement clearly implies that confusion exists only when the public believes that a product is sponsored by the mark's owner *when in fact it is not*. *Monte Carlo's* holding (that there is no confusion as a matter of law when the trademark owner authorizes the manufacture and labeling of the goods in question) is consistent with the statutory meaning of the term. The holding certainly reflects the purpose underlying federal trademark law which the "confusion" standard is designed to effectuate, namely, protecting the public's ability to rely on a trademark as indicative of the source of the goods, which in turn, is indicative of the goods' quality. *See In re Polar Music International AB*, 714 F.2d 1567, 1571 (Fed.Cir. 1983) ("A trademark informs the public of a source of the goods and assures them of its quality.").

Moreover, *Monte Carlo* carries *DEP*'s tentative expressions to a logical conclusion. While it is true that the dicta of the *DEP* court are not controlling, the Court of Appeals' stated skepticism as to the proposition at issue is nevertheless significant.

Finally, although the *Monte Carlo* line of cases has been criticized for being inconsistent with the Supreme Court's decision in *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), *see Weil Ceramics & Glass, Inc. v. Dash*, 618 F.Supp. 700, 706 (D.N.J.1985), careful comparison of the decisions establishes that the difference is semantical rather than substantial. *Katzel*, narrowly construed, held that when a French "face powder" manufacturer sold plaintiff its entire United States business, including goodwill and trademarks, and thereafter, defendants imported the same French manufacturer's face powder and sold it in the United States in boxes closely resembling plaintiff's packaging, such sales were an infringement of plaintiff's trademark. *Katzel* has been more broadly interpreted as holding that a trademark has a separate legal existence under each country's laws and therefore, that foreign goods which carry a trademark with the approval of the foreign mark's owner may nonetheless be infringing when sold in the United States without the approval of the United States owner of the mark. *See Osawa & Company v. B & H Photo*, 589 F.Supp. 1163 (S.D.N.Y.1984); *accord Weil Ceramics & Glass, Inc. v. Dash, supra*, 618 F.Supp. at 700. Whether confined to its facts or imputed with the broader interpretation, *Katzel* is readily distinguishable from *Monte Carlo* because in *Monte Carlo* and its progeny (as in the case at hand) the owner of the United States trademark had authorized manufacturing the goods for distribution in the United States.[6] *See El Greco Leather Products Co., supra*, 599 F.Supp.

---

**5.** Moreover, "[i]n order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market [citations omitted]." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2d Cir.1979); *In re Polar Music International AB*, 714 F.2d 1567, 1571 (Fed.Cir.1983) ("A trademark need not be the name of the manufacturer of the goods and the public need not know the name of the owner of the mark [citations omitted]." This is noteworthy because Ballet Makers' claim essentially is that the public will be confused as to the *manufacturer* of the CAPEZIO products. The "source"

of the goods in the trademark context, however, is the person who controls the quality of the goods, *see id.*, in this case, U.S. Shoe.

**6.** The ostensible conflict derives from the fact that *Osawa & Company v. B & H Photo*, 589 F.Supp. 1163 (S.D.N.Y.1984) and *Weil Ceramics & Glass, Inc. v. Dash*, 618 F.Supp. 700 (D.C.N.J. 1985) use the term "genuine" to refer to any legitimately labeled product, whether foreign or domestic, when in fact, one interpretation of *Osawa* and *Weil* is that whether goods are "genuine" must be determined within territorial borders.

at 1397–98. In sum, *Monte Carlo*'s reasoning is persuasive, and applicable to the facts of the action at hand.

■ It is undisputed that U.S. Shoe is the "owner of the entire right, title and interest in and to the trademarks 'CAPEZIO' ... and to the goodwill symbolized by the marks," *see* complaint at ¶ 7 and Exhibit A at 1–2 and 6, ¶ 8, and that U.S. Shoe authorized Manning to produce and distribute the controversial goods. In compliance with the Act, Manning's license states that the control of the quality of the CAPEZIO products is retained by U.S. Shoe and there is no claim that control has been relinquished.[7] Accordingly, as in *Monte Carlo*, Manning's goods are not, as a matter of law, imitations but rather the genuine product, sponsored by and produced for U.S. Shoe. Under these circumstances use of the CAPEZIO mark accurately designates the correct source of the goods and does not create a likelihood of confusion within the meaning of the statute. Accordingly, plaintiff's claims for infringement and unfair competition are dismissed.[8]

## II. Breach of Contract

Count three of the complaint accuses U.S. Shoe of breaching the 1974 agreement as amended in 1983. Both Ballet Makers and U.S. Shoe appear to accept the fact that Ballet Makers has the exclusive right to sell in specified locations CAPEZIO *dance and recreation* footwear and accessories. U.S. Shoe argues, however, that summary judgment should be granted in its favor because its actions in licensing Manning do not constitute a breach. Manning, U.S. Shoe asserts, is only licensed to sell *"fashion"* accessories.

Ballet Makers maintains that summary judgment should be granted in its favor

because the Manning agreement permits Manning to sell "hosiery," which includes "dance tights," as evidenced by the fact that the agreement is not limited to "fashion hosiery." According to Ballet Makers, the undisputed fact that Manning is selling tights to Capezio Concept Stores, as Manning believed it had a right to do pursuant to its agreement with U.S. Shoe, clearly demonstrates that the 1974 agreement as amended has been breached.

■ The short answer is that summary judgment cannot be granted on the present record because there are genuine issues of fact material to the question whether U.S. Shoe breached the 1974 agreement. Critical to this inquiry is whether there is a meaningful distinction between "dance tights" and "fashion tights," and to date there is evidence in the record supporting each side of the question. Accordingly, U.S. Shoe's summary judgment motion is denied.

\* \* \* \* \* \*

The current posture of the case is troubling. Dismissal of the Lanham Act claims requires, at a minimum, dismissal of Ballet Makers' claim against Manning for inducing a breach of contract (Count four) since there is no longer a federal basis upon which to attach a pendent state claim, and there is no diversity of citizenship between the two New York corporations. Accordingly, U.S. Shoe remains as the only defendant in the action. Ballet Makers' complaints, however, stem from the Manning agreement and Manning's acts as well as U.S. Shoe's actions. In the event that U.S. Shoe is found to be in breach of the agreement, it appears evident that Ballet Makers will seek to have U.S. Shoe curtail at least some of Manning's sales activities. Under these circumstances there is some doubt

---

**7.** Indeed, if U.S. Shoe did not retain control over the quality of the goods it could be deemed to have abandoned its mark. *See Defiance Button Machine Company v. C & C Metal Products Corp.*, 759 F.2d 1053, 1059 (2d Cir.), *cert. denied*, — U.S. ——, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *Universal City Studios v. Nintendo Co., Ltd.*, 578 F.Supp. 911, 929 (S.D.N.Y.1983), *aff'd*, 746 F.2d 112 (2d Cir.1984).

**8.** Manning's challenge of Ballet Makers' standing to sue for infringement is not explored because we have concluded that Ballet Makers has not stated a claim for infringement as a matter of law.

whether Manning will be able to protect its interests if it is not a party to the litigation—that is, whether Manning is or would be a "person needed for just adjudication" within the meaning of Fed.R.Civ.P. 19. On the other hand, since Manning cannot be joined to the action without destroying diversity jurisdiction, it is questionable whether the action should proceed in federal court. The parties have not raised or briefed the issue and will accordingly be given an opportunity to do so if they desire.

### Conclusion

For the foregoing reasons the motion to dismiss Counts one, two and four is granted. The motion to dismiss, or in the alternative for summary judgment, on Count three is denied.

It is so ordered.