**JOHN PAUL MITCHELL SYSTEMS and G.A. Kayser & Sons, Inc., Plaintiffs,**

v.

**PETE–N–LARRY'S INC., Tops Markets, Inc., Tops, Inc. d/b/a Vix Deep Discount, F.W. Woolworth Co., Inc. d/b/a The Rx Place, Frank Rondinelli Hair Salons, Inc., Frieman Ratner Corp., d/b/a HBC Price Rite and Pharmhouse Corp., Defendants.**

No. 93–CV–0360E(H).

United States District Court, W.D. New York.

Oct. 3, 1994.

Charles Stewart Desmond, Gibson, McAskill & Crosby, Buffalo, NY, for John Paul Mitchell.

Robert E. Glanville, Phillips, Lytle, Hitchock, Blaine & Huber, Buffalo, NY, for G.A. Kayser.

Charles C. Swanekamp, Saperston & Day, Buffalo, NY, for Pete–N–Larry's.

Robert J. Lane and Kevin A. Szanyi, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, for Tops Markets, Inc., Tops, Inc., F.W. Woolworth and Pharmhouse Corp.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

John Paul Mitchell Systems ("JPMS"), the manufacturer of the "Paul Mitchell" brand of hair care products ("Paul Mitchell Products"), and G.A. Kayser & Sons, Inc. ("Kayser"), JPMS's authorized distributor in the central and western areas of New York, brought this action against various retailers—Pete–N–Larry's, Inc. ("Pete–N–Larry's"), Tops Markets, Inc. and Tops, Inc. d/b/a VIX Deep Discount (collectively "Tops"), F.W. Woolworth Co., Inc. d/b/a The Rx Place ("Rx Place") and Pharmhouse Corp. ("Pharmhouse") [1]—alleging *inter alia* that the defendants' unauthorized sales of Paul Mitchell Products constitute violations of the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.*, ("the Lanham Act"), unfair competition under the laws of New York, tortious interference with the contracts and fraud.[2] Presently before this Court are motions by the remaining defendants (Pete–N–Larry's, Tops, Rx Place and Pharmhouse) to dismiss and for summary judgment.[3] Such motions will be granted in part and denied in part.

The Complaint alleges that Paul Mitchell Products "are designed and intended to be sold only in and to professional hair salons and professional hairstylists" and "specifically are not authorized to be sold in retail stores" such as those of the defendant retailers. Further, "JPMS does not authorize the sale of Paul Mitchell Products except where the consumers have the opportunity to consult with or receive the recommendation and advice of trained professional hairstylists."

Such restrictions on the channels of distribution, it is claimed, are necessary to insure the quality of Paul Mitchell Products. In this regard, JPMS's authorized sellers, including the hairstylists and salons, are contractually bound not to sell those products "to any person they know or have reason to suspect intends to sell the products to someone else." The plaintiffs allege that the defendant retailers, who are not authorized distributors of Paul Mitchell Products, have diverted such products from JPMS's exclusive distribution network, in contravention of the restrictions imposed by JPMS. The plaintiffs also allege that the defendant retailers are selling these products at their stores to general customers without offering any opportunity for the professional consultation required by JPMS. They further allege that "[d]efendants, acting in concert with numerous, diverse and unknown others, from time to time, in order to conceal the identity of the intermediate sellers, obliterate the batch codes on [Paul Mitchell Products]," which codes not only are required by federal and state laws but "are the only effective way to identify specific products for quality control purposes in the event that a recall of products is necessary." Moreover, the Complaint quotes a legend which is included on each Paul Mitchell Products container, which states that JPMS does not guarantee the quality of Paul Mitchell Products unless they are sold within the authorized distribution network. It is alleged that the defendants fail to "conspicuously" notify their customers of such lack of guarantee.

■ The first cause of action alleges (after incorporating all preceding paragraphs as summarized above) that, "[b]ecause the circumstances of defendants' sale of Paul Mitchell Products carries the potential for customer deceit and confusion, and interferes with

---

**1.** The suit was also brought against defendants Beauty Products, Etc., Inc. ("Beauty Products"), Frank Rondinelli Hair Salons, Inc. ("Rondinelli"), Joe LaMack d/b/a Joe's Beauty Salon ("Joe's"), Lawrence Kent, Inc. d/b/a Wards West Side Leader Drug Mart ("Wards") and Frieman Ratner Corp. d/b/a HBC Price Rite. The cases against three of those defendants—*i.e.*, Beauty Products, Joe's and Wards—have been discontin-

ued by stipulation and order. The record indicates no activity regarding the remaining two defendants. None of the defendants mentioned in this footnote is relevant to the present motion.

**2.** The Complaint also raises breach of contract claims against Rondinelli and Joe's.

**3.** See footnote 1, *supra*.

plaintiffs' ability to control the quality of their product, defendants' conduct violates The Trademark Act of 1946, 15 U.S.C. § 1501 et seq. (1988), otherwise known as the Lanham Act."[4] While the Complaint does not specifically cite the sections of the Lanham Act under which this claim is raised, the plaintiffs' memorandum of law filed in response to the present motions points to two of its provisions—viz., section 32(1), 15 U.S.C. § 1114(1), for trademark infringement and section 43(a), 15 U.S.C. § 1125(a), for false designation of origin or affiliation. Under either section, the touchstone of liability is the same—namely, a likelihood of consumer confusion as to the source of the goods. See, e.g., Bandag, Inc. v. Al Bolser's Tire Stores, 750 F.2d 903, 911 (Fed.Cir.1984); Ballet Makers v. United States Shoe Corp., 633 F.Supp. 1328, 1331 (S.D.N.Y.1986) ("where * * * plaintiff's claims for infringement and unfair competition are based upon virtually the same behavior, i.e., the alleged improper use of the [mark], the evidence needed to prove confusion is also the same"). The defendants argue that there exists no possibility of any such confusion because what they are selling are the authentic products of a quality identical to those sold in JPMS's authorized venues. In other words, it is their contention that the products retailed at their stores are "genuine" goods, the sale of which, even unauthorized, can not give rise to a Lanham Act violation.

 Before assessing the merits and the particulars of such argument, it is helpful at this point to note the different approaches courts may take in this area of jurisprudence, differences that can often create a certain quantum of semantic confusion and can as well have potential substantive implications. The root of such potential confusion is the oft-repeated maxim that "[a]s a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner," Polymer Technology Corp. v. Mimran, 975 F.2d 58. 61 (2d Cir.1992). See, e.g., Matrix Essentials v. Emporium Drug Mart, 988 F.2d 587, 590 (5th Cir.1993); Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104 (4th Cir.1991); NEC Electronics v. Cal Circuit ABCO, 810 F.2d 1506, 1509 (9th Cir.), cert. denied, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). This, at least at first, appears to be a simple truism which plainly observes that, for a cause of action for trademark infringement to exist, the sale of marked goods must likely cause confusion, in addition to being without consent—see Franchised Stores of New York, Inc. v. Winter, 394 F.2d 664, 668 (2d Cir.1968) (infringement exists when an individual uses a trademark without consent in connection with the sale of covered goods where such use is likely to cause confusion or to deceive purchasers). Of course, the mere fact that the sale is unauthorized—that is, without consent—does not give rise to an infringement claim when the marked goods are genuine. See H.L. Hayden Co. of N.Y. v. Siemens Medical Systems, 879 F.2d 1005, 1023 (2d Cir.1989) ("the unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation"). Bluntly and from a somewhat different angle, when the products are genuine—that is, identical and from the same origin—there is nothing that really would confuse consumers, at least nothing that the Lanham Act deems protectable, and the requisite consumer confusion can not be demonstrated. This of course does not hold true when the products are not the same—i.e., not genuine. Therefore, the pivotal question in the instant case becomes whether there exists a material difference between the products sufficient to create the likelihood of consumer confusion. See Societe Des Produits Nestle v. Casa Helvetia, 982 F.2d 633, 640 (1st Cir.1992) ("the presence or absence of a material difference—a difference likely to cause consumer confusion—is the pivotal determinant of Lanham Trade–Mark Act infringement in a gray goods case"); see also Orig. Appalachian Artworks v. Granada Electronics, 816 F.2d 68, 73 (2d Cir.) (the existence of a material difference that creat-

4. The Complaint refers to Paul Mitchell Products as being the products of both plaintiffs. Although Kayser most likely has an interest in ensuring the sanctity of its contracts with the authorized hair salons that distribute the products, it is inferred that the products are those of only JPMS.

ed the confusion was most important in finding infringement by gray market products), *cert. denied,* 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987).

To follow through with this line of reasoning, the analysis by the United States Court of Appeals for the First Circuit in *Societe Des Produits Nestle, supra,* although involving "gray-market" or "parallel-import" goods—a situation analogous but yet arguably distinguishable from the present one—is particularly illuminating. There, after having determined the existence *vel non* of "material difference" to be the linchpin of liabilities under either section 32(1) or section 43(a), the Court concluded that "the existence of any difference between the registrant's product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion sufficient to support a Lanham Trade–Mark Act claim." *Id.* at 641. The threshold of materiality must be kept low, the court explained, because "it is by subtle differences that consumers are most easily confused." *Ibid.* The Court further noted that "[t]here is no mechanical way to determine the point at which a difference becomes 'material'" and that "[s]eparating wheat from chaff must be done on a case-by-case basis." *Ibid.*

Under the rationale pursued thus far, a question such as "What is genuineness?" appears to have only tangential value to the primary issue of consumer confusion *vel non.* In addition and perhaps somewhat in contrast to the line of reasoning noted in the preceding paragraph, some courts appear, at least impliedly, to have chosen to read into the aforementioned maxim a new substantive rule—to wit, a test of genuineness—which defines the outer boundaries of Lanham Act claims. *See Shell Oil Co.,* 928 F.2d at 107 (treating genuineness as a threshold question to determine whether a defendant's use of trademarks implicates trademark law, before proceeding to discuss the question of consumer confusion); *NEC Electronics,* 810 F.2d at 1510 (adopting for sections 32 and 43 purposes the conclusion in *Olympus Corp. v. United States,* 792 F.2d 315, 321, 322 (2d Cir.1986), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988), that section 42 of the Lanham Act, 15 U.S.C. § 1124, barring importation of goods that "copy or simulate" a trademark, did not apply to genuine goods). *See also Polymer Technology Corp.,* 975 F.2d at 61–63; *El Greco Leather Products Co., Inc. v. Shoe World,* 806 F.2d 392, 395–396 (2d Cir.1986), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987); *Monte Carlo Shirt, Inc. v. Daewoo Intern. (America),* 707 F.2d 1054, 1057–1058 (9th Cir.1983) (California law); *Diamond Supply Co. v. Prudential Paper Products Co.,* 589 F.Supp. 470, 475–476 (S.D.N.Y.1984). Under this approach, the determinative inquiry is whether the allegedly infringing product is genuine; if the answer is in the affirmative, the Lanham Act will not be applied thereto. This approach implicates the fundamental tension that exists between two conflicting policies—that of protecting the interest of the trademark owner in monopolizing the mark and that of fostering free competition. It also implicates the judicial concern as to the impediment which an unwarranted expansion of trademark and unfair competition jurisprudence would place on free competition and, thence, the interests of the consumer public in general.

One origin of this school of thought might be found in a dictum stated in *DEP Corp. v. Interstate Cigar Co., Inc.,* 622 F.2d 621, 622 fn. 1 (2d Cir.1980), where the Court observed that "[i]t does appear anomalous in any event that a trademark infringement action would lie here where the soap sold by [defendant] is in fact genuine and not spurious." Of course, however, the choice of the term "genuine," as opposed to "lacking a material difference," may be purely semantic and utterly inconsequential. *See, e.g., Societe Des Produits Nestle,* 982 F.2d at 638 (a product is not genuine when its sale is unauthorized *and* it differs materially from the real good). Courts have most often discussed the question of genuineness in conjunction with that of consumer confusion, and—given the fact that the genuineness concept is a derivation of the consumer-confusion concept *see, e.g., DEP Corp.,* 622 F.2d at 622 fn. 1; *Monte Carlo Shirt, Inc.,* 707 F.2d at 1058,—the test for genuineness may yet prove to be identical to or a mere component of that for the

likelihood-of-consumer-confusion rationale discussed *supra. Cf., Orig. Appalachian Artworks,* 816 F.2d at 73 (a material difference that creates confusion makes goods "not genuine"); *cf. Home Box Office, Inc. v. Corinth Motel, Inc.,* 647 F.Supp. 1186, 1192 (N.D.Miss.1986) (no infringement found because "the unauthorized display of authentic [products] would not likely lead to the type of consumer confusion cognizable under the trademark laws"). Further, any attempt to arrive at a precise legal definition of "genuine" must overcome severe obstacles, not the least of which is the manner in which the term has been used—with courts attributing differing meanings to it varying from any legitimately labeled product, (*see, e.g., Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.,* 632 F.Supp. 1525, 1528 (S.D.N.Y.1986), and *Osawa & Company v. B & H Photo,* 589 F.Supp. 1163 (S.D.N.Y.1984)) to, somewhat tautologically, a product that does not cause confusion *see, e.g., Orig. Appalachian Artworks,* 816 F.2d at 73, and *Societe Des Produits Nestle,* 982 F.2d at 638—using the term in two different meanings within a single page of discussion—, *Babbit Electronics, Inc. v. Dynascan Corp.,* 828 F.Supp. 944, 956–957 (S.D.Fla.1993)—stating that "identical goods sold in an unauthorized manner are not necessarily genuine for purposes of the Lanham Act"—, *Disenos Artisticos E Industriales, S.A. v. Work,* 676 F.Supp. 1254, 1269 (E.D.N.Y.1987)—"even if there were no possibility of confusion as to source of origin when a product is 'genuine,' there might still be confusion as to sponsorship when a 'genuine' product is manufactured by a foreign manufacturer but distributed in the U.S. without the authorization of and in competition with the U.S. trademark owner"—and *Ballet Makers,* 633 F.Supp. at 1334 fn. 6—noting the inconsistency. This sort of obstacle tempts one to declare the test of "genuineness" to be either meaningless or unworkable and to abandon it entirely.

Nonetheless, courts have trudged on inexorably and arrived at some rules that are, at least in their appearance, inherent in the "genuineness" standard—most notable of which being that "[a] product is not truly 'genuine' unless it is manufactured and distributed under quality controls established by the manufacturer." *Shell Oil Co.,* 928 F.2d at 107; *see also El Greco Leather Products Co., Inc.,* 806 F.2d at 395; *cf. Societe Des Produits Nestle,* 982 F.2d at 643 (discussing the question of quality control in deciding the existence *vel non* of "material difference"). And, moreover and most importantly for the present purpose, one may find a variant of the "genuineness" rationale in *Matrix Essentials,* 988 F.2d at 591—a case on which the defendants heavily rely—in which it was stated that "[t]he common thread in [the precedents in this area] where trademark infringement was found is that each involved some defect (or potential defect) in *the product itself* that the customer would not be readily able to detect." *But see Bayer Co. v. Sumner Printing Co.,* 7 F.Supp. 740 (N.D.Ohio 1934) (finding trademark infringement and unfair competition in a defendant's sale of aspirin in packages of two, whereas no such presentation had been adopted by the plaintiff); *cf. Societe Des Produits Nestle,* 982 F.2d at 643 ("more than subtle" differences in packaging "material"). The *Matrix Essentials* Court explained that, under the previous case law, Lanham Act violations had been found where the allegedly infringing products "contained or could potentially contain a latent product defect due to the unauthorized distributor's failure to observe the manufacturer and mark owner's rigorous quality control standards." 988 F.2d at 591. Under such a circumstance and "[m]ost importantly, a consumer would not necessarily be aware of the defective condition of the product and would thereby be confused or deceived." *Ibid.* Be it correct or incorrect, this "product itself" formulation, by explicitly focusing upon the qualitative aspect of the "confusion" inquiry—*i.e.,* what kinds of differences give rise to the type of confusion protectable under the Lanham Act—perhaps best exemplifies the aforementioned concern that underlies the "genuineness" inquiry. It must be noted, however and as one might expect, that the application of such rule would not be easy because of the difficulty in defining the parameters of what is "the product itself"—for instance, whether such should include the bottle that contains a treating material, the information printed on such bottle, the box that in turn contains the

bottle, the instructions placed in and printed on the box, or the carton that contains several of the boxes. Also, in view of such potential flexibility, it is not certain at present whether the results of this formulation should be any different from the result of the "materiality" inquiry discussed earlier.

As indicated at the outset, the differences discussed above appear largely semantic, but are not without substantive implications that resist facile application. In any event, this Court is not now called upon either to synthesize or to choose among potentially conflicting lines of reasoning for it finds that the present record does not warrant granting of a summary judgment under either approach. Here, the plaintiffs have alleged that Paul Mitchell Products, when sold by the defendants, are unaccompanied by professional consultation which is claimed to be essential to the effective performance of the products. These products are also without "batch codes" which are allegedly vital to their quality control effort in that those codes are the only means for the plaintiffs to identify and recall defective or outdated products. It is further claimed that the consumers are aware of the regulatory requirement that all hairsprays sold in New York indicate the date of manufacture by codes or otherwise and that those consumers will note the absence of the "batch code" and will likely attribute such apparent violation to the plaintiffs. More importantly, the batch codes have allegedly been obliterated in a fashion—by a physical chiselling away of the bottle's surface—so crude as to erase not only the codes but also all or portions of the trademarks, instructions, lists of ingredients and other writings printed on such surface. Indeed, on one of the bottles presented as an exhibit at the oral argument, the obliteration had resulted in the puncturing of the bottle itself, creating a hole large enough to permit leakage of the liquid. The plaintiffs also claim that the products sold by the defendants are not and cannot be guaranteed by JPMS but that, due to the defendants' alleged failure to notify their customers of such lack of guarantee, those customers do believe that such products are guaranteed by JPMS and, when dissatisfied, have requested reimbursement from JPMS, which requests JPMS has had to refuse at the risk of potential injury to its consumer goodwill. The defendants have not, for the purposes of this motion, seriously challenged those factual allegations—with the exception of the professional consultation, the allegedly essential nature of which, as the defendants point out, is seriously doubted in light of the defendants' own description of it—namely, that it, "at a minimum, takes the form of asking the potential customer whether he or she has any questions or needs any help in selecting a Paul Mitchell product [sic]." Affidavit of Michael Shadders (sworn to July 22, 1993). Such description leads one to wonder whether said "minimum" consultation might constitute the norm, especially in view of the absence of any other description of the consultation. While the defendants do question the plaintiffs' assertion that the batch codes are utilized, in part, for product recalls, by pointing to the deposition testimony of Melissa Britz, a former executive assistant of Kayser, that JPMS had, to her knowledge, never recalled any of its products—Declaration of Kevin A. Szanyi, filed August 17, 1993—, it is the right to control the quality—as well as the actual quality—that is afforded one of the most important protections under the Lanham Act. *See Polymer Technology Corp.,* 975 F.2d at 62. It is also of such right that the plaintiffs allege to have been deprived by the defendants' sale of products with obliterated codes. The demonstration that there had been no actual recalls does not necessarily negate the plaintiffs' assertion that they had been maintaining their ability to recall as an integral part of their quality control effort protected by the Lanham Act.

Those allegations, supported by affidavits and the statement of material facts, cannot be said to be legally insufficient. Granted, there remain some questions as to the viability of a certain portion of the individual allegations when left standing alone, *see Matrix Essentials, supra* (rejecting a hair care product manufacturer's claim that one retail drug store chain's unauthorized sale of the trademarked products without the professional consultation that is supposed to be available violates the Lanham Act); *but see Matrix Essentials, Inc. v. Karol,* 1992

WL 142292 (N.D.Illinois, June 17, 1992) (accepting a similar claim and denying the defendant's summary judgment motion). However the aggregate of the alleged circumstances, taken as true, does form a basis for a viable Lanham Act claim sufficient to survive the present motion. One need look no further than the alleged physical obliteration of the batch codes, the crudity of which method had not only left noticeable scars on the surfaces of the bottles but also erased the information printed on the bottles including the trademark and, in one instance, had jeopardized the physical integrity of the product itself. Given the low threshold required for the finding of materiality, this Court does find those differences created by such obliteration material as a matter of law, particularly on the present record, which contains little that allows for assessment of their significance. Also, it cannot be said that the products with obliterated codes are genuine as a matter of law in view of the physical change the obliteration had worked on the bottles, the information printed thereon and the liquid therein contained. *Cf., Polymer Technology Corp.*, 975 F.2d at 63 (repackaging of trademarked products interfering with quality control efforts raises a Lanham Act claim); *Orig. Appalachian Artworks, supra* ("Cabbage Patch Kids" dolls found not genuine when accompanied by "adoption papers" written in foreign language).

A case that was heavily relied on by defendants, *Matrix Essentials, supra*, is readily distinguished. Therein, unlike in this case, the plaintiff manufacturer had conceded that the quality of the product sold by the defendant drugstore chain was at least physically identical to those sold at authorized salons. *Id.* at 590. Under such circumstance, it was held that no Lanham Act claim could stand because there was no defect or potential defect in the product itself. *Id.* at 591. Herein, the defendants' products are alleged to be physically inferior to those of the authorized sellers due to the method of obliteration used. The defendant's motions will be denied as to the first cause of action.

■ The plaintiffs' second claim is substantially the same as the first with one exception. It alleges that the defendants' sale of Paul Mitchell Products with obliterated batch codes violates the Lanham Act because of a reason already alleged earlier in the Complaint—*i.e.*, that such sale exposes JPMS to potential civil and criminal liability for violation of New York's Department of Environmental Conservation's Consumer and Commercial Products regulations, set forth at 6 NYCRR, part 235. These regulations require that all hairsprays manufactured after August 26, 1992 and sold or offered for sale in New York display the date on which the product was manufactured or a code indicating such date. The plaintiffs explain in their memorandum of law that it is the likelihood of consumer confusion from said sales that forms the basis of the asserted Lanham Act violation. While it is questionable whether such narrow allegation is viable *per se*,[5] such issue need not be resolved here,

---

5. The defendants argue that no likelihood of confusion can be shown based on such allegation because JPMS cannot be held liable for the said regulatory violation. In support they point out that, under the relevant statutes, criminal liabilities are not to be imposed absent willful conduct on the part of JPMS—*see* New York's Environmental Conservation Law ("NYECL") § 71–2105—and civil penalties do not apply to "any violation which was caused by an act of God, war, strike, riot, catastrophe or *other conditions as to which negligence or willful misconduct on the part of such person was not the proximate cause*." NYECL § 71–2109 (emphasis added). No such liabilities can be shown, the defendants argue, because, by the plaintiffs' own account, the obliteration of the codes was done by third parties without any negligence or willful conduct on the part of JPMS. In response the plaintiffs claim that the likelihood of consumer confusion

"arises from the damage that would result to the reputation and goodwill associated with the JPMS trademark if civil or criminal actions were brought against [JPMS]—even if they ultimately were rejected"—Plaintiffs' Memorandum of Law at 29—and that "[b]ecause JPMS is *aware* that its products are being offered for sale by defendants under circumstances which do *not* comply with the regulations, it remains potentially subject to criminal and civil liability if it fails to take steps to prevent the violations"—*id.* at 32. The defendants reply that such argument is too speculative to present a ripe controversy, in that it speaks merely of a potential threat of the requisite likelihood of confusion, premised on the occurrence of an unlikely contingency—*i.e.*, commencement of a meritless lawsuit absent JPMS's negligence.

While the case law indicates some support for the plaintiffs' contention—*see Clairol, Inc. v. Asaro d/b/a Carousel Beauty Supply*, 1975 WL 898, at

in that this Court finds the second claim to be a mere repetition of the first and will dismiss it on that basis. The second claim plainly alleges a violation of the same statute as does the first (the Lanham Act) based on the factual allegations already raised therein (the plaintiffs' exposure to civil and criminal liabilities due to the defendants' sale of the obliterated products) and purportedly gives rise to the same legal predicate (the likelihood of consumer confusion). It further (as is the custom) repeats and realleges the allegations of all the previous paragraphs in the Complaint as if fully set forth anew. Both claims are against the same defendants and as the discussion thereof in the plaintiffs' memorandum of law discloses, they invoke the same provisions of the Lanham Act, sections 32(1) and 43(a), as the bases therefor. This Court perceives no reason—and the plaintiffs offer none—why such a duplicative claim should be preserved. The inquiry into the likelihood of confusion is a fact-specific endeavor, one that is unique to each case, which requires consideration of the totality of the circumstances. While one conceivably might separate the two claims by giving a narrow reading to each, such is impossible in view of the first claim's broadness, which states "[b]ecause the circumstances of defendants' sale of Paul Mitchell Products carries [sic] the potential for customer deceit and

confusion, and interferes [sic] with plaintiffs' ability to control the quality of their products, defendants' conduct violates [the Lanham Act]." It is noted that, in their argument, the plaintiffs have given a broader and therefore more indistinguishable reading to the second claim than the explicitly-reiterated allegations therein. The second claim will be dismissed.

■ The third cause of action under New York's unfair competition law almost exactly traces the second claim; it "realleges" all its preceding allegations including the statements of the first and second claims and states that "[b]ecause Defendants' sale of Paul Mitchell Products on which batch codes have been obliterated exposes JPMS to potential liability for violation of the aforesaid DEC regulations, such conduct constitutes unfair competition in violation of the laws of the State of New York." Arguments in the plaintiffs' memorandum of law herein make clear that this claim is intended to cover a scope as broad as the first claim. While, if such had been their intention from the beginning of the lawsuit, the claim could have and should have been drafted with much more clarity, this Court does not find that the circumstances require preclusion of such a broad reading of the claim. So read, it is plain that the claim cannot be dismissed at

*6 (E.D.Mich., 1975) ("Sales by defendant of plaintiff's products in a fashion which exposes plaintiff to tort liability claims and adverse publicity therefrom constitutes unfair competition [under Michigan law] against which plaintiff is entitled to an injunction."); cf. *Polymer Technology Corp.*, 975 F.2d at 64 (noting that "[t]he district court did not decide if defendants' [repackaging and retail distribution created violations of FDA regulations] or whether such conduct constitutes trademark infringement under either the quality control or unauthorized distribution theories."); *Clairol, Inc. v. Boston Discount Ctr. of Berkley*, 608 F.2d 1114, 1120 (6th Cir.1979) (an unfair competition suit under Michigan law, noting, *inter alia*, that the defendants exposed Clairol to potential criminal liability by selling the products without proper labeling in violation of the Pure Food and Drug Act); *Clairol, Inc. v. Cosmetics Plus*, 130 N.J.Super. 81, 325 A.2d 505, 510 (1974) (granting injunction under New Jersey law after noting *inter alia* that the defendant's sale violated New York and United States laws); *Clairol, Inc. v. Sarann Co., Inc.*, 146 U.S.P.Q. 726, 733 (Pa.Com.Pl.1965) (defendant's failure to conform with Federal and Penn-

sylvania statutes was one of the considerations in determining the remedy to be granted after finding unfair competition under Pennsylvania law); *Clairol, Inc. v. Peekskill Thrift Drug Corp.*, 141 U.S.P.Q. 147, 152 (N.Y.Sup.1964) (in a New York state law-based unfair competition suit, noting *inter alia* that "[i]f New York State or federal authorities institute legal proceedings based upon the allegation that 'Miss Clairol' in the hands of defendant is an 'adulterated' product, under [state and federal statutes], publicity attendant upon such enforcement proceedings and such an official characterization of 'Miss Clairol' is likely seriously to injure plaintiff's goodwill and business reputation"); *Clairol, Inc. v. L.H. Martin Value Center, Inc.*, 40 Misc.2d 875, 244 N.Y.S.2d 210, 211–212 (Sup.Ct., Nassau Co., 1963) (temporary injunction granted, upon finding of likelihood of injury to business reputation and penal law violation in defendant's sale)—, none of these cases, including the two cited by the plaintiffs—*Polymer Technology*, *supra*, and *Clairol, Inc. v. Boston Discount Ctr. of Berkley*, *supra*—directly supports a finding of unfair competition based solely upon the claim as narrowly alleged.

this juncture. A claim of unfair competition under New York law, like that of a Lanham Act violation, requires a showing of a likelihood of consumer confusion. *See Buffalo Fire and Safety Equipment Co., Inc. v. Buffalo Viking Machine Tool Corp.,* 89 A.D.2d 798, 453 N.Y.S.2d 509, 510 (4th Dept.1982). Although the defendants argue that such confusion does not exist here, this Court finds that the plaintiff's claim, as supported by the affidavits, is sufficient to overcome such challenge, principally for the reasons stated in the foregoing discussion of the first claim.

The fourth claim asserts—again after incorporating all that came before it— that "[d]efendants' purchase/sale of Paul Mitchell Products constitute intentional, tortious interference with the contracts between JPMS and its authorized distributors and/or between authorized distributors of Paul Mitchell Products and the hair salons to which those authorized distributors sell Paul Mitchell Products." In order to succeed on a claim for tortious interference with contract, a plaintiff must prove the existence of a valid contract between it and a third party, the defendant's knowledge of such contract, the defendant's intentional procuring of the breach thereof by the third party and resultant damages. *See Israel v. Wood Dolson Company,* 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956). "[T]he interference must be intentional, not merely negligent or incidental to some other, lawful, purpose." *Alvord & Swift v. Muller Constr. Co.,* 46 N.Y.2d 276, 281, 413 N.Y.S.2d 309, 385 N.E.2d 1238 (1978). The defendants claim that "because [they] have had no contacts or dealings with authorized JPMS distributors or hair salons, there can be no dispute that they did not 'procure' any breach of the JPMS/distributor contracts or the distributor/hair salon contracts." The defendants have also submitted supporting affidavits to this effect, stating that they never had any contact with either authorized JPMS distributors or authorized JPMS hair salons and that their product had come from unauthorized sellers. *See* Affidavit of Marcia McHenry (sworn to June 17, 1993); Affidavit of Michael Quinn (sworn to June 15, 1993); Affidavit of Steven Drahos (sworn to June 14, 1993); Affidavit of Jerome Biarsky (sworn to June 16, 1993); Affidavit of Elenterio A. Boni (sworn to July 8, 1993). In response, the plaintiffs argue that, "by virtue of defendants' knowledge of the nature of the distribution network for Paul Mitchell Products, defendants intentionally procured, directly or indirectly, the breach of various of these contracts by causing their as yet largely unidentified sellers either to breach their contractual obligations or to include others in the chain of title, who also remain unidentified, to breach their contractual obligations." As the defendants point out, the plaintiffs' contention, when stripped of its conjectural allegations based on unsupported or unalleged facts, is that the defendants should be held liable for tortious inducement because they purchased Paul Mitchell Products while knowing that such products would not have been obtainable unless, presumably, someone along the JPMS's distribution network had breached his, her or its contract with JPMS. While the fact that the defendants are at least two steps removed from the contractual relationship does not necessarily relieve them of liability—*see Benton v. Kennedy–Van Saun Mfg. & Eng. Corp.,* 2 A.D.2d 27, 152 N.Y.S.2d 955, 958 (1st Dept.1956) ("The circuity of defendant's actions will not relieve it of responsibility for its tortious misconduct"); *but see Isbrandtsen Co. v. Local 1291, Etc.,* 204 F.2d 495, 498 (3rd Cir.1953) ("neither in contract nor in tort have duties been extended very far beyond the immediate parties to the facts out of which a cause of action is said to arise")—, the plaintiffs' claim fails to show "inducement" of the alleged breach. *Cf.,* Restatement of Torts (2d) § 766, comment n (mere making of agreement by a third party with knowledge of the inevitable breach of contract by the other party does not constitute actionable inducement). The fourth claim will be dismissed.

Finally, the plaintiffs' fifth claim alleges that, "[b]y selling Paul Mitchell products [sic] from which batch codes have been eradicated, defendants have engaged in a fraudulent course of conduct that is calculated to prevent plaintiffs from identifying those intermediate sellers who are breaching their obligations to plaintiffs and that also pre-

vents plaintiffs from identifying stolen or adulterated product that might be offered for sale to the consuming public by defendants." There are four elements to a claim of fraud: misrepresentation, concealment or non-disclosure of a material fact; intent to deceive on the part of the defendant; justifiable reliance upon the misrepresentation by the plaintiff; and injury to the plaintiff as a result of such reliance. *Idrees v. American University of the Caribbean,* 546 F.Supp. 1342, 1346 (S.D.N.Y.1982). The defendants contend that, to the extent the Complaint charges them with non-disclosure, such claim cannot stand because there is no allegation of affirmative duty of disclosure owed by the defendants to the plaintiffs. *See Sterling Nat. Bank & Trust v. Federated Dept. Stores,* 612 F.Supp. 144, 147 (S.D.N.Y.1985). They further assert that they have never participated in the alleged act of concealment—*i.e.,* obliteration of batch codes—and have submitted affidavits supporting such assertion. *See* Affidavit of Marion McHenry (sworn to June 17, 1993); Affidavit of Michael Quinn (sworn to June 15, 1993); Affidavit of Steven Drahos (sworn to June 14, 1993); Affidavit of Jerome Biarsky (sworn to June 16, 1993); Affidavit of Elenterio A. Boni (sworn to July 8, 1993). In response, the plaintiffs state that they have never alleged that any particular defendant itself had actually removed the codes and argue that, while a claim for fraud based on non-disclosure requires a showing of the duty of disclosure, such general rule does not apply when the non-disclosure is accomplished by affirmative acts of concealment. As the defendants' affidavits have established, however, there is no showing of any such affirmative concealment by the defendants. The fifth claim will therefore be dismissed.

Accordingly, it is hereby **ORDERED** that the motions by defendants Pete–N–Larry's, Inc., Tops Markets, Inc. and Tops, Inc. d/b/a VIX Deep Discount, F.W. Woolworth Co., Inc. d/b/a The Rx Place and Pharmhouse Corp. to dismiss and for summary judgment are granted in part and denied in part and that claims two, four and five of the Complaint are dismissed as against such defendants.